**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | |
|---|---|
| KATHERINE SCHNEFKE,<br>on behalf of Plaintiff and the class<br>members described herein,<br><br>       Plaintiff,<br><br>       v.<br><br>STANLEY CHAO;<br>FIRST LOAN;<br>NP FINANCE, LLC;<br>UNKNOWN ACH PROCESSOR;<br>and JOHN DOES 1-10,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      3:23-cv-2653 |

## COMPLAINT – CLASS ACTION

1.     Plaintiff Katherine Schnefke ("Plaintiff") brings this action against Defendants Stanley Chao ("Chao"), First Loan, NP Finance, LLC ("NP Finance"), Unknown ACH Processor and John Does 1-10 to secure redress for usurious and illegal loans (such as <u>Exhibit A</u>) made to Illinois residents.

2.     Plaintiff seeks damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count I), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count II – the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, (Count III).

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d).

4.     This Court has personal jurisdiction over Defendants because they:

     a.     Knowingly participated in the making and collection of unlawful loans to

Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

       b.    Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

5.    Venue is proper because acts to obtain and collect the loans impacted Plaintiff in this District.

6.    Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

7.    Plaintiff Katherine Schnefke is a natural person who at all times relevant has resided

in Edwardsville, Illinois.

## **Defendant First Loan**

8.      First Loan is an entity of unknown organization which issues loans through the website FirstLoan.com.

9.      First Loan uses the addresses:

   a.      PO Box 1536, Lower Lake, CA 95457, and

   b.      16170 Main Street, Suite 1, Lower Lake, CA 95457.

10.      First Loan, via the website FirstLoan.com, offers loans at annual percentage rates of 700% and higher.

11.      First Loan currently claims to be "a Native American-owned business operated by the Elem Indian Colony of Pomo Indians" (Exhibit A, second page) and "a subsidiary of EIC Enterprises, a wholly-owned arm and instrumentality of the Elem Indian Colony of Pomo Indians, a federally-recognized Indian tribe" (Exhibit A, sixth page).

12.      Previously, First Loan claimed to be owned by the Kashia Tribe, an unrelated small Native American tribe which purported to own over twenty internet lenders.

13.      First Loan's web server's IP address is 52.43.81.11, which corresponds to a physical location in Oregon, more than 1,000 miles from the Elem Tribe's reservation. (Exhibit B)

14.      Many of the First Loan loans are made to Illinois residents, including Plaintiff Katherine Schnefke.

15.      These residents have received funds via ACH transfers into bank accounts located in Illinois. The loans also provide for repayment via ACH transfers.

16.      At no time has First Loan held any type of consumer lending license from the Illinois Department of Financial and Professional Regulation.

17.      At no time has First Loan held a bank or credit union charter.

18.      Under Illinois law, First Loan was therefore not allowed to make loans to Illinois consumers at rates exceeding 9%. 815 ILCS 205/4.

19.     First Loan nevertheless advertises and makes loans to Illinois residents at rates greatly exceeding 9%.

20.     At the time of the loan at issue, First Loan's website stated that it would not make loans to residents of Arkansas, Connecticut, Florida, Georgia, Maine, Maryland, Massachusetts, Minnesota, New York, North Carolina, Pennsylvania, Vermont, Virginia, and West Virginia. (Exhibit C) Illinois was added to the list in 2022 (Exhibit D) after another Illinois resident sued for making a usurious loan. More recently, First Loan's website states "We regret to inform you that First Loan is no longer taking new applications. . . ."

21.     The reason why First Loan did not lend to persons in the listed states is because state authorities or private parties in those jurisdictions aggressively enforce usury laws.

22.     First Loan thus affirmatively sought out Illinois residents for such loans at the relevant time.

23.     All loans made by First Loan were made at an annual percentage rate exceeding the 9% which a non-bank lender which does not have a license from the Illinois Department of Financial and Professional Regulation may charge for a loan made to an Illinois resident.

**Defendant Chao**

24.     Defendant Chao is a natural person who may be found at 10443 Los Feliz Dr., Orlando, FL 32836 or 4700 Millenia Blvd., #270, Orlando, FL 32839.

25.     Chao is the beneficial owner of many online lending websites. He operates, and is the beneficial owner of FirstLoan.com.

26.     On information and belief, Chao has near-total control over the First Loan lending business.

27.     At no time has Chao or any of his websites or entities held any type of consumer lending license from the Illinois Department of Financial and Professional Regulation.

28.     At no time has Chao or any of his websites or entities held a bank or credit union charter.

-4-

29.     Under Illinois law, neither Chao or any of his websites or entities were therefore allowed to make loans to Illinois consumers at rates exceeding 9%. 815 ILCS 205/4.

30.     Some collections of these loans are conducted under the name of Apex Servicing.

### Defendant Unknown ACH Processor

31.     Defendant Unknown ACH Processor the person or entity who, at all times relevant, processed the Automated Clearing House ("ACH") payment transactions for First Loan.

32.     Plaintiff believes she can ascertain the identity of Unknown ACH Processor since it uses a unique Prearranged Payment and Deposit Identification number ("PPD ID"), which Plaintiff should uncover in discovery.

### Defendant NP Finance, LLC

33.     Defendant NP Finance, LLC is a limited liability company organized under Delaware law with its principal address located at 50 Tice Blvd., Suite 160, Woodcliff Lake, NJ 07677. Its registered agent is Harvard Business Serves, Inc., 16195 Coastal Hwy, Lewes. DE 19958.

34.     On information and belief, NP Finance, LLC provides the capital used to fund the loans made by First Loan.

35.     On information and belief Defendant Chao owns NP Finance, LLC and is its sole member. Defendant Chao previously acted as the registered agent for NP Finance, LLC.

### Defendants John Does 1-10

36.     Defendants John Does 1-10 are other persons and entities that participated in the lending activities described herein.

### FACTS

### Defendants' Lending Operations

37.     Defendant Chao is a businessman who has owned and controlled a number of high-interest online loan websites, including FirstLoan.com. Others are InboxLoan.com and CometLoans.com, which are no longer originating loans.

38.     All of these websites purported to be owned and operated by tiny, remote,

economically impoverished Native American tribes.

39.     For example, CometLoans.com was purportedly owned by the Tonto Apache Tribe, a tribe in rural Payson, Arizona, about 95 miles northeast of Phoenix. The Tonto Apache Tribe has 110 enrolled members and an 85-acre reservation, the smallest of any Native American reservation in Arizona. Due to its small size, lack of natural resources, and remote location, the Tonto Apache Tribe has struggled economically.

40.     First Loan is purportedly owned and operated by the Elem Indian Colony of Pomo Indians (the "Elem Tribe").

41.     The Elem Tribe is a group of Pomo Indians based near Clearlake, California.

42.     The Elem Tribe has marginal economic activities due to its small size, remote location, and lack of natural resources.

43.     Despite claims that the Elem Tribe owns First Loan, the true beneficial owners are Chao, his companies, and his non-tribal investors.

44.     Chao, his companies, and his non-tribal investors manage, underwrite, collect, and profit from the lending operation.

45.     Chao takes advantage of these tribes' desperation by offering to pay them modest amounts in exchange for their claiming ownership of his illegal payday lending operations, enabling Chao to assert that the loans are being made by the tribes themselves.

46.     On information and belief, the Elem Tribe receives less than 2% of loan revenues for being the straw owner of the website and, more importantly, providing a veil of sovereign immunity.

47.     Such arrangements are referred to as "rent-a-tribe" schemes.

48.     Through such schemes, non-tribal payday lenders such as Chao attempt to avoid the restrictions of state and federal laws which would otherwise prohibit usurious loans. They do this by issuing loans in the name of a Native American tribal business entity that purports to be shielded from state and federal law via tribal sovereign immunity.

49.     In reality, the tribal lending entity is a mere "front" for an illegal lending scheme. All substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for the use of the tribe's name, those operating the payday lending scheme pay the cooperating tribe a fraction of the revenues generated, almost always in the single digits.

50.     Chao also owns a number of other entities that are related to "tribal" lending, including:

        a.      ARB Call Facilities, Inc., which provides call center services for Chao's payday lenders and other entities, with call centers in Costa Rica, the Philippines, Egypt and other locations. Chao has held himself out as President of ARB. (Exhibit E)

        b.      Sabre Analysis, LLC, which claims to be a "portfolio servicing company specializing" in "Data Analytics, Lead Purchase Strategy, Collections Strategies (and) Reporting."

        c.      Apex Servicing, which is  an entity of unknown organization which collects loans issued by First Loan and other payday lending websites beneficially owned by Chao. Apex Servicing has a  website (https://www.apexservicing.com/), on which it lists addresses of (i) PO Box 637, 333 South Main Street, Blanding, Utah 84511 and (ii) #1 Wakpamni Lake Housing, Batesland, South Dakota 57716, which is located on the Oglala Sioux Reservation. The premises at 333 South Main Street, Blanding, Utah 84511 appear to contain a pottery shop called Cedar Mesa Pottery, a CPA office and a tax preparation office.  Apex Servicing claims on its website that it "is a Tribal licensed third-party servicer. Apex Servicing is a Native American owned business operated by Wakpamni Lake Community Corporation an Oglala Sioux Tribe of the Pine Ridge Indian Reservation, a federally recognized and sovereign nation located in the United States. Apex Servicing abides by all applicable federal laws and regulations and tribal law as established by the Oglala Sioux Tribe of the Pine Ridge Indian Reservation."

<u>**Sovereign Immunity as a Defense to State Usury Laws**</u>

51.     An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

52.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

53.     An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

54.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

55.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

56.     The fact that First Loan was not started by the Elem Tribe but was an existing business that was purportedly absorbed by the Elem Tribe indicates that there is no sovereign immunity. *Williams v. Big Picture Loans, LLC*, 329 F.Supp.3d 248, 272 (E.D.Va. 2018) ("the tribe was not starting an independent lending operation but rather facilitating the absorption of Red Rock's

fully functioning lending enterprise").

57.    Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

58.    Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y.). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

### Defendants' Loans

59.    First Loan makes loans through its website, FirstLoan.com, to consumers at interest rates in excess of 700% annually. (Exhibits A, C)

60.     Per First Loan's website, a $500 loan results in repayment of $3,887.82 if paid bi-weekly for a year. The total interest charged would be $3,387.82, which according to First Loan, equates to an annual percentage rate of 777.83%.

61.    The loans are collected under the name of Apex Servicing (Exhibits F-H).

62.    On information and belief, Apex Servicing only services loans issued by Chao's network of online lenders.

### Loan to Plaintiff

63.    On October 13-14, 2021, "First Loan" made a loan to Plaintiff Katherine Schnefke at a disclosed annual percentage rate of 777.05%. (Exhibit A)

64.    The loan agreement is a standard form.

65.    The loan was made for personal purposes.

66.     The principal amount was transferred to Plaintiff's bank account in Illinois via ACH.

67.     The loan was made entirely via Internet.

68.     Unknown ACH Processor processed the transaction.

69.     The loan was to be repaid via ACH.

70.     Plaintiff made payments on the loan, including interest at more than 9%.

71.     First Loan's lending does not actually occur on the Tribe's reservation.

72.     A significant majority of the transaction occurs within the State of Illinois  –
applying for the loan and receiving and collecting the funds.

73.     The place where a consumer is located when he or she submits an application via an
online portal with a Native American tribe determines where the transaction takes place for
jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018)
("However, the patrons' act of placing a bet or wager on a game of DRB while located in California
constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not
protected by IGRA.").

74.     Plaintiff has never set foot on the Elem Tribe's land in California.

75.     Loans to Illinois residents made in the same manner as the loan to Plaintiff are
governed by the laws of the State of Illinois.

76.     Defendant Chao is responsible for orchestrating the lending scheme pursuant to
which First Loan lent money to Plaintiff and other Illinois residents.

77.     Unknown ACH Processor was paid for its role in processing ACH payments relating
to the loans.

78.     NP Finance was paid for its role in funding loans made by First Loan.

### Illinois Regulation of Lending

79.     Under the Predatory Loan Prevention Act, effective upon enactment on March 23,
2021, even a licensed lender may not charge more than 36% interest to an Illinois resident. 815 ILCS
123/1-1 *et seq.*

-10-

80.    Previously, higher rates were permitted to licensed lenders, banks and credit unions under the Payday Loan Reform Act, 815 ILCS 122/1-1 et seq., and the Consumer Installment Loan Act, 205 ILCS 670/1 *et seq.*

81.    At all relevant times a consumer lender who did not have a license or banking or credit union charter was limited to 9% under the Illinois Interest Act, 815 ILCS 205/4.

82.    Any loans to Illinois consumers at more than 36%, or made by unlicensed persons at more than 9%, are void and unenforceable.

83.    The Predatory Loan Prevention Act provides:

Section 15-5-10. Violation. Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan.

Section 15-5-15. No evasion.

(a) No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to, making loans disguised as a personal property sale and leaseback transaction; disguising loan proceeds as a cash rebate for the pretextual installment sale of goods or services; or making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate or interest, consideration, or charge than is permitted by this Act through any method including mail, telephone, internet, or any electronic means regardless of whether the person or entity has a physical location in the State.

(b) If a loan exceeds the rate permitted by Section 15-5-5, a person or entity is a lender subject to the requirements of this Act notwithstanding the fact that the person or entity purports to act as an agent, service provider, or in another capacity for another entity that is exempt from this Act, if, among other things:

    (1) the person or entity holds, acquires, or maintains, directly or indirectly, the predominant economic interest in the loan; or

    (2) the person or entity markets, brokers, arranges, or facilitates the loan and holds the right, requirement, or first right of refusal to purchase loans, receivables, or interests in the loans; or

    (3) the totality of the circumstances indicate that the person or entity is the lender and the transaction is structured to evade the requirements of this Act.

    Circumstances that weigh in favor of a person or entity being a lender include, without limitation, where the person or entity:

        (i) indemnifies, insures, or protects an exempt person or entity for any costs or risks related to the loan;

-11-

(ii) predominantly designs, controls, or operates the loan program; or

(iii) purports to act as an agent, service provider, or in another capacity for an exempt entity while acting directly as a lender in other states.

84.     In addition:

a.      The Consumer Installment Loan Act provides, at 205 ILCS 670/20(d), that if any person who does not have a license issued under this Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."

b.      The Payday Loan Reform Act provides, at 815 ILCS 122/4-10(h), that "if a lender who does not have a license issued under this Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."

c.      The Consumer Installment Loan Act makes it a felony to engage in the business of making loans covered by the Act without a license. (205 ILCS 670/20(a))

85.     Finally, the Illinois criminal usury statute defines the making of a loan by unlicensed persons at more than 20% interest as a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

86.     All of the loans made by First Loan were, on information and belief, made at more t han 36%; indeed, at rates exceeding 360%.

87.     Consumers may not waive the protections of these Illinois laws by contract:

a.      The Predatory Loan Prevention Act provides (815 ILCS 123/15-10-25): "No waivers. There shall be no waiver of any provision of this Act."

b.      The Payday Loan Reform Act provides (815 ILCS 122/4-40) that there shall be no waiver of any provision of this Act.

       c.      Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 237 F.Supp.3d 130, 149-50 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017). A criminal law may not "be bypassed by the mere existence of a choice of law provision contained in a contract." *Electrical & Magneto Serv. Co. v. AMBAC Int'l Corp.*, 941 F.2d 660, 663 (8th Cir. 1991).

88.     All such loans are made for personal, family or household purposes. Businesses do not borrow money at over 700% interest.

89.     Defendants were on notice of the unlawful nature of their lending activities.

90.     In 2019, the Washington Department of Financial Institutions issued notices that Defendants' lending and collection activities violated Washington law for the same reasons they are violating Illinois law. (Exhibit I)

91.     On information and belief, Defendants received or were aware of such notices.

92.     Even the most cursory inquiry into the legality of collecting 700%+ loans made to Illinois residents over the Internet would have disclosed to Defendants that they were violating the law.

93.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state lenders that make loans covered by the Consumer Installment Loan Act or Payday Loan Reform Act via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569; *In the Matter of Money Mutual, LLC,* No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581.

## COUNT I – ILLINOIS INTEREST ACT

94.     Plaintiff incorporates paragraphs 1-93.

95.     This claim is against all Defendants.

96.     Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

97.     Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

98.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

99.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of "First Loan" at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

100.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

101.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

102.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

103.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

104.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

-14-

105.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.      Individual actions are not economically feasible.

      b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.      Damages as provided in 815 ILCS 205/6.

      ii.      Attorney's fees, litigation expenses and costs of suit; and

      iii.      Such other and further relief as the Court deems proper.

## COUNT II – PREDATORY LOAN PREVENTION ACT
## AND ILLINOIS CONSUMER FRAUD ACT

106.    Plaintiff incorporates paragraphs 1-93.

107.    This claim is against all Defendants.

108.    Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

109.    Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## CLASS ALLEGATIONS

110.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

111.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of "First Loan" at more than 36% interest (c) which loan was made on or after March 23, 2021.

112.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

113.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there

-15-

are at least forty class members.

114.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

115.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

116.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

117.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights;

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.    Compensatory damages;

        ii.    Punitive damages;

        iii.    Attorney's fees, litigation expenses and costs of suit; and

        iv.    Such other and further relief as the Court deems proper.

## COUNT III – RICO

118.    Plaintiff incorporates paragraphs 1-93.

119.    This claim is against Chao, who is the RICO "person."

120.    All loans made in the name of "First Loan" to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

121.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. §1961(6).

-16-

122.    "First Loan" is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

123.    Defendant Chao is associated with this enterprise.

124.    Defendant Chao conducted or participated in the conduct of the affairs of "First Loan" through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

125.    Plaintiff was deprived of money (interest in excess of 9%) as a result.

## CLASS ALLEGATIONS

126.    Plaintiff brings this claim on behalf of a class.

127.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of "First Loan" at more than 18% interest (c) which loan was made on or after a date 4 years prior to the filing of suit.

128.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

129.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

    b.    Whether "First Loan" is an "enterprise."

    c.    Whether Defendant Chao is associated with "First Loan."

    d.    Whether Defendant Chao conducted or participated in the affairs of "First Loan" through a pattern of making and collecting unlawful loans.

130.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

131.    Plaintiff's claim is typical of the claims of the class members. All are based on the

same factual and legal theories.

132.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i.    Treble damages;

    ii.    Attorney's fees, litigation expenses and costs of suit; and

    iii.    Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.


/s/ Daniel A. Edelman
Daniel A. Edelman

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN COMBS LATTURNER**
**       & GOODWIN, LLC**
20 S. Clark St., Suite 1500
Chicago, IL 60603
(312) 739-4200
(312) 739-0379 (FAX)

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.


*/s/ Daniel A. Edelman*
Daniel A. Edelman